UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                                    Chapter 11

GOLIATH VENTURES INC. (FL),                Case No. 26-13174-RAM
GOLIATH VENTURES INC. (WY),                Case No. 26-13176-RAM
                                                          *Jointly Administered*

              Debtors.
_____/

## RECEIVER'S MOTION (1) TO EXCUSE COMPLIANCE WITH 11 U.S.C. § 543 OR IN THE ALTERNATIVE (2) TO APPOINT A TRUSTEE PURSUANT TO 11 U.S.C. § 1104

Michael S. Budwick, in his capacity as receiver ("*Receiver*") of Goliath Ventures Inc., a Wyoming corporation ("*Goliath WY*"), and Goliath Ventures Inc., a Florida corporation f/d/b/a Gen-Z Venture Firm, Inc. ("*Goliath FL*") (together, "*Debtors*"), seeks an Order from this Court excusing his compliance with certain requirements set forth in 11 U.S.C. § 543 or in the alternative directing the appointment of a trustee pursuant to 11 U.S.C. § 1104(a). In support, the Receiver states as follows:

### I.    JURISDICTION

1.    This matter is a "core proceeding" as that term is used in 28 U.S.C. §157(b)(2).

2.    This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334 and 157.

### II.    BACKGROUND

#### a.    The Circuit Court litigation and the appointment of the Receiver

3.    On February 25, 2026, Mehal Patel filed a complaint commencing an action in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida ("*Circuit Court*"), styled *Mehal Patel v. Goliath Ventures, Inc.*, Case No. CACE-26-003310 ("*Receivership Action*").

4.    On February 27, 2026, the Plaintiff, along with and/or supported by proposed

1

intervenors TwentyWon Ventures, LLC, Gregory Garrett Wilson, and John D. Euliano, as Trustee of the John D. Euliano Revocable Trust UTD 5-27-14, and Brevard Nursing Academy, LLC d/b/a Coastal Technical Institute (collectively, "**Proposed Intervenors**"), filed the Emergency Verified *Ex Parte* Motion to Appoint Receiver ("**Motion to Appoint Receiver**").

5. On or about March 1, 2026, Proposed Intervenors filed their Combined Motion to Intervene and Notice of Joinder in Plaintiff's Motion to Appoint Receiver.

6. Thereafter, the Circuit Court entered its (1) Amended Order on Plaintiff's Emergency Verified *Ex Parte* Motion to Appoint a Receiver dated March 3, 2026 ("**Amended Order**") and (2) Agreed Order Granting the Receiver's Agreed Motion to Confirm that the Receivership Estate Includes Goliath Ventures Inc., a Florida Corporation (f/k/a Gen-Z Venture Firm Inc.) dated March 5, 2026 (together, "**Receivership Orders**"). Copies of the Receivership Orders are attached as **Composite Exhibit 1**.

7. On March 3, 2026, the Receiver filed his Notice of Acceptance and Oath of Receiver in the Receivership Action.

### b. The Receivership Orders vested the Receiver with sweeping authority

8. The Receivership Orders vested the Receiver with complete corporate control over the Debtors and their property, subject of course to the supervision of the Circuit Court.

9. The Receiver's overarching mandate is to serve as an independent fiduciary to protect the interests of all of the Debtors' creditors, who largely appear to be crime victims.

10. The Debtors' prior senior-insider, Christopher Alexander Delgado ("**Mr. Delgado**") (along with every other officer, director, manager, employee, agent or representative), was completely divested of any decision-making authority on behalf of the Debtors, with all such

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

authority being vested exclusively with the Receiver.[1]

11.    The Receiver was delegated all powers previously held in any capacity by Mr. Delgado or any other persons.[2] These expansive powers included the authority to file bankruptcy petitions for the Debtors, which the Receiver did for the reasons set forth in the Case Management Summary at Dkt. No. 11.[3]

12.    Similarly, the Receivership Orders vested the Receiver with authority to take immediate possession, custody, and control of the Debtors and all property wherever located.[4] The Receivership Orders authorized the Receiver to, among other things: (i) identify, secure, preserve, investigate, recover, and administer the Debtors' property; (ii) demand turnover; (iii) prosecute, defend, and settle claims on the Debtors' behalf; and (iv) retain professionals.[5]

### c.  Goliath, its corporate history, and Mr. Delgado

13.    On February 15, 2019, Gen-Z Venture Firm Inc. ("*Gen-Z*") was incorporated as a Florida for profit corporation. On September 13, 2021, Gen-Z changed its name to Goliath Ventures Inc. On September 3, 2025: (i) Goliath FL was voluntarily dissolved; and (ii) Goliath WY was incorporated in Wyoming as a for profit corporation.

14.    On February 20, 2026, the United States of America filed a Criminal Complaint ("*Criminal Complaint*") against Mr. Delgado, in *U.S.A. v. Delgado*, Case No. 6:26-mj-01240-LHP (M.D. Fla.) ("*Criminal Action*"), at ¶ 23:

> According to information provided to potential investors, including marketing materials and GOLIATH's website, GOLIATH is "a joint venture private fund that invested in blockchain and cryptocurrency projects." GOLIATH further characterized itself as "a pioneering firm specializing in

---

[1] *See* Amended Order, ¶ 25.
[2] *See* Amended Order, ¶ 26(b).
[3] *See* Amended Order, ¶ 26(k).
[4] *See* Amended Order, ¶ 25.
[5] *See* Amended Order, ¶ 25.

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

blockchain development and decentralized finance strategies" and purported to leverage "liquidity pools to facilitate passive income generation, enhance market efficiency, and provide qualified investors with access to innovative financial opportunities."

15.     In the Criminal Action, the United States alleges Mr. Delgado violated 18 U.S.C. § 1343, Wire Fraud, and 18 U.S.C. § 1957, Money Laundering, and perpetrated a Ponzi scheme through the Debtors. A copy of Criminal Complaint is attached as **Exhibit 2**.

### d.  The Receiver's background and activities following his appointment

16.     Immediately upon his appointment, the Receiver began taking steps to secure and investigate the Debtors' assets, records, and operations.

17.     The Receiver retained professionals to assist with these efforts, including Meland Budwick, P.A. as counsel and a computer forensic expert.

18.     Meland Budwick, P.A. is a Miami-based boutique bankruptcy, financial fraud, and litigation law firm[6] with extensive experience representing bankruptcy trustees, receivers, and other court-appointed fiduciaries in complex financial fraud, asset-recovery, and Ponzi scheme litigation.

19.     For example, in the Petters Company, Inc. Chapter 11 case pending in Minneapolis, Minnesota, involving the third largest Ponzi scheme in U.S. history with $2 billion in cash-on-cash investor losses, the firm serves as litigation oversight counsel managing hundreds of millions of dollars in litigation claims. The firm also represents Barry Mukamal, as Liquidating Trustee for two Palm Beach based hedge funds that lost $650 million in the Petters Ponzi scheme. Together with Mr. Mukamal, the firm has recovered $235 million for the two hedge funds' stakeholders. As a second example, the firm serves as special litigation counsel to Christina Lovato, as Chapter 7 Trustee in Reno, Nevada for DC Solar Solutions, Inc. and

---

[6] The firm also practices in the real estate and corporate arenas, among others.

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

affiliated entities through which Jeff Carpoff perpetrated a $950 million Ponzi scheme. Mr. Carpoff's Ponzi scheme is the largest in the history of the Eastern District of California. To date, the firm has recovered over $130 million for creditors (with at least two actions remaining) while working with creditors who separately have also recovered significant amounts through their independent actions.

20.    Moreover, multiple partners of the firm have served as court appointed fiduciaries. For example, the U.S. District Court appointed Mr. Budwick as receiver for Thomas Abrams who perpetrated a Ponzi scheme in Palm Beach County. The Miami-Dade County Circuit Court appointed Mark Meland as receiver for Innovida Holdings, LLC, through which Claudio Osorio defrauded ten investors of approximately $40 million.[7]

21.    Since his appointment, the Receiver and his professionals have undertaken a range of activities in furtherance of their role, including efforts to: (i) secure and safeguard the Debtors' assets, property, and records; (ii) identify and investigate the Debtors' operations; (iii) communicate with federal criminal and civil law enforcement; (iv) obtain documents and information from, among others, accountants, attorneys, and other professionals associated with the Debtors; (v) gather information from potential victims, their professionals, and other third parties; (vi) investigate potential transfers of assets and identify potential recovery sources; and (vii) obtain documents, records, and other information relevant to the Debtors.

22.    The Receiver's efforts are ongoing.

---

[7] *See* Receiver's Emergency Motion (1) to Excuse Compliance with 11 U.S.C. § 543 and (2) to Appoint Trustee Pursuant to 11 U.S.C. § 1104, *In re InnoVida Holdings, LLC*, No. 11-17702-LMI, Dkt. No. 10 (Bankr. S.D. Fla. Mar. 25, 2011); Order Directing Appointment of Chapter 11 Trustee, *In re InnoVida Holdings, LLC*, No. 11-17702-RAM, Dkt. No. 39 (Bankr. S.D. Fla. Mar. 30, 2011); Order Granting Receiver's Emergency Motion (1) to Excuse Compliance with 11 U.S.C. § 543 and (2) to Appoint Trustee Pursuant to 11 U.S.C. § 1104, *In re InnoVida Holdings, LLC*, No. 11-17702-RAM, Dkt. No. 46 (Bankr. S.D. Fla. Apr. 4, 2011).

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

### III.    ARGUMENT

#### a.    The Court should excuse compliance with § 543(a) & (b)

23.    The Receiver is a "custodian" within the meaning of the Bankruptcy Code. *See* 11 U.S.C. § 101(11).

24.    11 U.S.C. § 543(a) provides that a custodian with knowledge of the commencement of a bankruptcy case may not make disbursements from, or take action in the administration of, property of the debtor or property of the estate, except as is necessary to preserve such property. Section 543(b) further requires the custodian to deliver property of the debtor to the trustee and file an accounting of property in the custodian's possession, custody, or control.

25.    However, § 543(d)(1) authorizes the Court, after notice and a hearing, to excuse compliance with § 543(a) and (b) if the interests of creditors would be better served by allowing the custodian to remain in possession, custody, or control.

26.    The Receiver was appointed in an emergency Broward County Circuit Court proceeding because independent and responsible fiduciary control was necessary to protect the Debtors, their assets, and their books and records. *See* Amended Order, ¶¶ 17, 18. The Receivership Orders displaced all insider control and vested that authority exclusively in the Receiver. *See* Amended Order, ¶ 24.

27.    Since his appointment, the Receiver and his professionals have investigated the Debtors' affairs, secured and ensured the safekeeping of records and information, communicated with governmental authorities and third parties, and have taken steps to identify and preserve assets belonging to the estate. For example, the Receiver has obtained documents and information from certain of the Debtors' pre-receivership professionals and other parties and has

6

requested additional documents and information from other of the Debtors' pre-receivership professionals and third parties.

28.     Prior to the receivership, the U.S.A. took possession of the Debtors' books and records, and the Receiver has confirmed with the United States that those items are being safekept. However, as of yet, the U.S.A. has not agreed to share a duplicate set. Nevertheless, the Receiver continues to obtain information from third parties to identify estate property and evaluate potential recovery opportunities. While the Receiver continues to engage in good faith with the U.S.A. (including this morning), if an agreement is not reached as to their records then the Receiver intends to seek turnover. In the meantime, the Receiver is in the process of issuing Rule 2004 document discovery to a number of third parties, including the Debtors' pre-petition depository institutions.

29.     The United States has also seized the Debtors' bank accounts although the amount taken has not been confirmed, as well as several luxury motor vehicles.

30.     Mr. Delgado has been released pending further proceedings, subject to significant conditions, including pretrial supervision, home detention with GPS monitoring, travel restrictions, surrender of his passport, a $1 million appearance bond, and restrictions on contact with victims, witnesses, and former directors and investors. *See* Criminal Action, Order Setting Conditions of Release, Dkt. No. 13. Mr. Delgado appears to be cooperating with law enforcement. The Order Setting Conditions of Release reflects that he agreed to repatriate certain funds from accounts in Dubai and to turn over certain funds, jewelry, vehicles, and other tangible assets. *See id.* at pg. 5. The U.S.A. subsequently represented that Mr. Delgado agreed to surrender specified vehicles, watches, jewelry, and other assets. *See* Criminal Action, Dkt. No. 22, at pgs. 1–7. The court thereafter modified the conditions of release by requiring Mr. Delgado, within seventy-five days, to deposit funds from his Emirates NBD High Interest Yield Account

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

into the court registry and prohibiting any sale or transfer of identified tangible personal property. *See* Criminal Action, Dkt. No. 25, at pgs. 2-5.

31.    The U.S.A. has assured the Receiver that it has performed a fulsome investigation into the Debtors' crypto and digital assets with the assistance of qualified experts and has secured or is in the process of securing those assets. While the Receiver has not obtained an accounting or the specific details of the U.S.A. efforts, the U.S.A.'s assurance of its focus and capabilities, together with the Receiver's interest in avoiding duplication of efforts and interference with law enforcement, has satisfied the Receiver at this time.

32.    While Mr. Delgado has not (yet) entered into a plea agreement in the Criminal Action, given the allegations in the Criminal Complaint coupled with his consensual turnover of substantial personal assets, presumably he recognizes he faces a significant prison sentence and undoubtedly he should not be entrusted to manage the estate and its recovery efforts.

33.    Under these circumstances, the Receiver submits that creditors are better served by allowing the Receiver to remain in possession, custody, and control of the Debtors and estate property. The Receiver is already an independent fiduciary administering the estate, is well qualified to maximize the recovery to creditors (many of whom appear to be crime victims), he and his professionals are already familiar with the Debtors and their operations and records, and he is and has been working on asset-recovery efforts. The Receiver expects that the primary source of recovery for creditors will be derived from the investigation and prosecution of litigation claims. The Receiver is well-suited to perform this function given his extensive experience and track record in large Ponzi scheme cases.

34.    Excusing compliance with § 543 will preserve continuity in the administration of the estate and allow those efforts to continue without interruption under this Court's supervision. By contrast, requiring compliance with § 543 at this stage would provide no meaningful benefit

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

to creditors and would risk disrupting the ongoing investigation and recovery efforts presently underway.

35.    The Receiver understands that the Office of the U.S. Trustee has already taken steps to form an official committee of unsecured creditors. As a bankruptcy professional whose practice largely focuses on complex financial fraud cases, the Receiver along with his team are well experienced in working together with official committees to maximize recoveries for victims.

36.    Accordingly, the Court should excuse compliance with § 543(a) and (b), and authorize the Receiver to remain in possession, custody, and control of the Debtors and estate property unless and until this Court orders otherwise.

### b.  In the alternative, a trustee should be appointed under § 1104(a)(1) and (2)

37.    Section 1104(a)(1) provides that the Court shall appoint a trustee for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, either before or after the commencement of the case. Section 1104(a)(2) further provides that the Court shall appoint a trustee if doing so is in the interests of creditors, equity security holders, and other interests of the estate.

38.    In the event the Court excuses compliance with § 543(a) and (b), then cause under § 1104(a)(1) would not exist as the Receiver is capable of managing the affairs of the estate including the recovery efforts.

39.    However, if for any reason the Court does not excuse compliance, then cause would exist under § 1104(a)(1) in which case the Court should then direct the appointment of a chapter 11 trustee.

40.    As described above, the United States alleges in the Criminal Action that Mr. Delgado operated a Ponzi scheme through the Debtors. Allegations that a debtor was used to

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

perpetrate a Ponzi scheme constitute fraud and dishonesty within the meaning of § 1104(a)(1) and support the appointment of a trustee.[8]

41.     In addition, prior to the bankruptcy filing, the Circuit Court in the Receivership Action determined that the appointment of a receiver was necessary to protect the Debtors and their assets. The Receivership Orders displaced insider control and vested authority over the Debtors in the Receiver. Under these circumstances, there is no doubt that prior management cannot fulfill the fiduciary duties required of a debtor in possession.[9]

42.     Absent excusing compliance, appointment of a trustee would also be warranted under § 1104(a)(2) as it would then be in the best interests of the Debtors' creditors, the estate, and other interested parties. Many of the Debtors' creditors appear to be crime victims, and their interests are best served by administration of the estate by an independent fiduciary who will investigate the Debtors' affairs and pursue potential recovery actions for the benefit of creditors.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[8] *See In re World Vision Entm't, Inc.*, 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002) ("A Ponzi scheme is by definition fraudulent.").

[9] *See In re V. Savano Oil & Heating Co.*, Inc., 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee.").

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

WHEREFORE, the Receiver requests this Court enter an Order: (1) excusing his compliance with § 543(a) and (b); or in the alternative (2) directing the appointment of a trustee pursuant to § 1104(a); and (3) providing for any other relief this Court deems just and proper.

Dated: March 19, 2026.

/s/ *Solomon B. Genet*
Solomon B. Genet, Esquire
Florida Bar No. 617911
sgenet@melandbudwick.com
Alexander E. Brody, Esquire
Florida Bar No. 1025332
abrody@melandbudwick.com
MELAND BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

*Attorneys for the Receiver and*
*Proposed Attorneys for Debtors*

IN THE CIRCUIT COURT FOR THE SEVENTEENTH
JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

MEHAL PATEL,
an individual,

        CASE NO.: CACE-26-003310

        Plaintiff,

v.

GOLIATH VENTURES INC.,
a Wyoming corporation,

        Defendant.

_____/



Filed In Open Court
CLERK OF THE CIRCUIT COURT
ON  3/3/26
BY  nbwd

## AMENDED[1] ORDER ON PLAINTIFF'S EMERGENCY VERIFIED EX PARTE MOTION TO APPOINT A RECEIVER

THIS CAUSE came before the Court on Plaintiff Mehal Patel's Emergency Verified Ex Parte Motion to Appoint a Receiver (the "Motion"). The Motion is verified by Plaintiff Mehalf Patel and joined and further verified by TwentyWon Ventures LLC, Gregory Garrett Wilson, and John D. Euliano as Trustee of the John D. Euliano Revocable Trust UTD 5-27-14, Brevard Nursing Academy, LLC d/b/a Coastal Technical Institute, (collectively with Patel, the "Verified Movants"). The Court has reviewed the Motion and attachments, including the complaints incorporated therein, and is otherwise fully advised in the premises. The Court hereby makes the following findings of fact and conclusions of law and enters the following Order.

### FINDINGS OF FACT

#### Background and the Nature of the Emergency

1. Defendant Goliath Ventures Inc. ("Goliath") is a Wyoming corporation that transacts business in Florida and utilized Florida contact information and banking arrangements in connection with its agreements and performance. The Court finds it has jurisdiction over the parties and subject matter of this action.

2. Verified Movants have each presented specific facts and evidence establishing that Goliath solicited and accepted substantial sums from investors/"partners" through written joint venture agreements ("JVAs") tied to purported cryptocurrency "liquidity pool" activity.

---

[1] This order replaces the previous order entered by the Court and is being re-issued solely to correct a scrivener's error in the previous order.

**COMPOSITE EXHIBIT 1**

**** FILED: BROWARD COUNTY, FL Brenda D. Forman, CLERK 3/3/2026 11:56:10 AM.**** !

Case 26-13174-RAM, Doc 20 Filed 03/19/26 Page 13 of 51

3.      The JVAs described in the verified pleadings contain express provisions (a) guaranteeing the return of principal "without diminution or impairment," and (b) requiring timely processing of withdrawals upon email request—measured in days, not months.

4.      The Court finds, based on the Motion, that beginning in or around September–October 2025, Goliath stopped paying promised distributions and stopped honoring withdrawal and return-of-principal obligations, while continuing to control the accounts, records, and access necessary for victims to determine the location and status of their funds. Goliath ignored demands for mediation, notices of dispute, demands and requests for information, and demands for the guaranteed return of investment.

5.      The Motion further establishes that Goliath has ignored demands for information, demands for return of funds, and demands for mediation, and in multiple instances issued written "Exit Agreements" confirming account balances and promising remittance within defined periods, but then failed to remit. In one instance, it appears that Goliath actually opened a demand from counsel and sent it back to an investor who was seeking mediation and a return of his deposit. No other communication was had, requests to accept service of lawsuits were declined or ignored, and again no information or return of monies were provided. Now, things have apparently worsened with the arrest of Delgado, his apparent placement on house arrest for alleged wire fraud and embezzlement of Goliath funds and the apparent termination of all Goliath employees.

6.      The Court finds that Verified Movants have demonstrated immediate, substantial, and continuing harm, including: (a) TwentyWon's contributions alleged to be at least $4,000,000.00 with amounts demanded totaling approximately $50,000,000.00; (b) Wilson's contributions alleged to be at least $5,815,000.00, with amounts owed alleged to be approximately $8,743,763.65 as of his filing; (c) the Trust's account balances and withdrawals alleged to exceed $1,206,231.38; (d) BNA's balances and amounts owed alleged to exceed $241,500.00; and (e) Patel's balances and amounts owed alleged to exceed $193,000.00.

7.      The Court further finds these verified allegations demonstrate that this dispute is not isolated; it is systemic, as it appears from the face of the Motion that there are other individuals and entities who have contacted Plaintiff's counsel, other individuals who have filed lawsuits, and other individuals and entities who have and will continue to suffer harm to the tune of $328,000,000.00 or more if the Court does not intervene.

### The DOJ Announcement and the Heightened Risk of Dissipation

8.      The Motion attaches and incorporates public announcements and sworn materials from federal authorities reflecting that Goliath's President and Chief Executive Officer, Christopher Alexander Delgado, has been arrested on federal charges including wire fraud and

money laundering, and that the criminal complaint alleges Goliath was operated as a Ponzi scheme that obtained at least $328 million from victim investors through false promises of monthly returns generated through cryptocurrency liquidity pools. The Court makes no findings as to guilt or innocence in the federal case. However, the Court finds that the public arrest announcement and the sworn materials incorporated into the Motion materially amplify the risk that remaining assets and critical records will be moved, concealed, destroyed, or otherwise placed beyond recovery absent immediate Court control.

9. The Court finds that the verified pleadings establish that the assets at issue include cash, cryptocurrency, and crypto-linked accounts and systems. Unlike traditional assets, cryptocurrency assets can be transferred quickly, across jurisdictions, with little or no notice to victims. Records can be altered or deleted, credentials can be changed, and assets can be dissipated in a manner that renders later recovery materially more difficult, expensive, or impossible. Moreover, it appears that Delgado has terminated all or most of Goliath's employees leaving Goliath unmanaged or, at a minimum undermanaged or improperly managed by Delgado himself.

10. The Court finds that this case presents an imminent risk of waste, dissipation, concealment, or destruction of corporate assets and records, and that any delay in imposing Court supervision risks irreparable harm and permanent loss.

### No Notice Required

11. The Court finds, based on specific facts shown in the Motion, that immediate and irreparable injury, loss, or damage will result to Verified Movants before Goliath can be heard in opposition. The Court further finds that the giving of notice would likely accelerate or precipitate the injury by providing those with access to Goliath's accounts, wallets, credentials, and records an opportunity to move assets and destroy or conceal evidence before effective judicial control can be implemented. Moreover, and in part noted above, Goliath has seemingly no employees and no counsel handling the many lawsuits filed in this Circuit, all prior notice to Goliath and Delgado has gone unanswered, ignored, or rejected, and thus any notice hear would serve no purpose other than harm.

12. The Court further finds that the time required to notice and conduct an adversarial hearing would permit the threatened irreparable injury to occur. The Court specifically finds that this risk is heightened where (a) withdrawals have already been demanded and refused, (b) multiple lawsuits are pending or anticipated, (c) the enterprise is alleged to involve fraud, and (d) the assets include crypto and crypto-linked accounts that can be transferred instantly and irreversibly.

### CONCLUSIONS OF LAW

13. Florida courts possess inherent equitable authority to appoint a receiver. A receiver is "a disinterested person appointed by the court for the protection or collection of property that is the subject of diverse claims." *Granada Lakes Villas Condo. Ass'n, Inc. v. Metro-Dade Invs. Co.*, 125 So. 3d 756, 758–59 (Fla. 2013). Equitable receiverships are particularly appropriate where fraud, self-dealing, or waste is shown. *Id.* at 759.

14. Receiverships may be appointed for the protection of creditors. *Christian Broad. Network, Inc. v. Turner Commc'ns Corp.*, 368 So. 2d 1345, 1349 (Fla. 4th DCA 1979). A court of equity may, upon a proper showing, appoint a receiver of property at the instance and for the benefit of creditors. *Knickerbocker Tr. Co. v. Green Bay Phosphate Co.*, 56 So. 699, 701 (Fla. 1911). A receiver may be appointed where actual fraud, or mismanagement amounting to fraud, may reasonably portend imminent danger of loss of corporate assets. *McAllister Hotel, Inc. v. Schatzberg*, 40 So. 2d 201, 203 (Fla. 1949).

15. Florida Rule of Civil Procedure 1.620 governs applications for receivers and provides that the notice provisions of Rule 1.610 apply. Fla. R. Civ. P. 1.620(a). Rule 1.610 authorizes temporary injunctive relief without notice where specific facts shown by affidavit or verified pleading establish that immediate and irreparable injury will result before the adverse party can be heard and where counsel certifies efforts made to give notice and why notice should not be required. Fla. R. Civ. P. 1.610(a)(1).

16. Florida appellate authority recognizes that trial courts may issue injunctions and appoint receivers without notice where circumstances warrant. *State v. Beeler*, 530 So. 2d 932, 933–34 (Fla. 1988); *Karafilakis v. Stavroulakis*, 150 So. 277, 277–78 (Fla. 1933); *Inverrary Gardens Condo. I Ass'n, Inc. v. Spender*, 939 So. 2d 1159, 1160 (Fla. 4th DCA 2006). A receiver may be appointed without notice only if the Rule 1.610 requirements are satisfied and the Court enters findings stating the reasons notice was not required and how irreparable harm might result if immediate action is not taken. *Phillips v. Greene*, 994 So. 2d 371, 373 (Fla. 3d DCA 2008). A movant satisfies the "no notice" requirement by demonstrating how and why notice would accelerate the injury or that the time required to notice a hearing would permit the threatened irreparable injury to occur. *Smith v. Knight*, 679 So. 2d 359, 361–62 (Fla. 4th DCA 1996).

17. The Court concludes that Verified Movants have shown: (a) irreparable harm absent immediate Court control due to the risk of dissipation, concealment, and destruction of records; (b) the inadequacy of legal remedies where assets can vanish before judgment; (c) a substantial likelihood of success on the merits based on written guarantees of principal and withdrawal obligations coupled with repeated nonpayment; and (d) that the public interest will not be disserved by entry of this Order. *See Shafer v. Shafer*, 898 So. 2d 1053, 1055 (Fla. 4th DCA 2005) (citing *Wexler v. Lepore*, 878 So. 2d 1276, 1281 (Fla. 4th DCA 2004)).

18.     The Court further concludes that immediate appointment of a receiver is necessary to preserve assets and records and prevent corporate waste and dissipation. *See DeSilva v. First Cmty. Bank of Am.*, 42 So. 3d 285, 288–90 (Fla. 2d DCA 2010); *Edenfield v. Crisp*, 186 So. 2d 545, 549 (Fla. 2d DCA 1966). A court of equity is empowered to issue injunctive relief to prevent officers or directors of a corporation from wrongfully dealing with corporate assets. *Schwadel v. Uchitel*, 455 So. 2d 401, 403 (Fla. 3d DCA 1984).

## HOLDING

Based upon the Motion, its exhibits incorporated therein, and the authorities cited above, all of which are expressly incorporated herein, it is hereby ORDERED AND ADJUDGED as follows:

### Grant of Motion; Temporary Status-Quo Injunction

19.     The Motion is GRANTED.

20.     Effective immediately upon entry of this Order, and until the Receiver files the Notice of Acceptance described below, the Court enters a temporary status-quo injunction to preserve the res, maintain the status quo, and prevent irreparable harm. During this period, Goliath, Christopher Alexander Delgado, and all officers, directors, agents, employees, affiliates, representatives, and all persons acting in concert with any of them, are enjoined from:

   a.   transferring, withdrawing, encumbering, selling, pledging, dissipating, concealing, or otherwise disposing of any assets of Goliath, whether held in fiat currency or digital assets (including cryptocurrency), except as expressly authorized in writing by the Receiver after the Receiver's appointment becomes effective;

   b.   creating new accounts, wallets, or custodial arrangements for Goliath assets; changing, rotating, or disabling credentials; or otherwise altering access controls for any bank, exchange, custodian, payment processor, wallet, or financial account in Goliath's name or for its benefit;

   c.   destroying, deleting, overwriting, concealing, altering, or removing any books and records of Goliath, including without limitation: investor records, communications, account statements, wallet addresses, private keys/seed phrases, exchange logins, transaction histories, ledgers, CRM data, devices, servers, and cloud-stored materials;

   d.   soliciting, accepting, or taking any additional investor funds or "contributions" under any investment, joint venture, or similar program.

21. This status-quo injunction is entered solely to preserve assets and records pending the Receiver's acceptance and control and does not constitute an adjudication of ultimate liability.

### Appointment of Receiver; Acceptance; Effect of Acceptance

22. The Court hereby appoints Michael Budwick of Meland Budwick f/k/a Meland Russin & Budwick (the "Receiver") as receiver over Goliath.

23. The Receiver shall file a notice with the Court confirming acceptance of the appointment and certifying that he is ready, willing, and able to neutrally accomplish his duties (the "Notice of Acceptance" or "Notice"). Upon the filing of the Notice, the temporary status-quo injunction in Paragraphs 2–3 shall dissolve by operation of this Order in favor of the Receiver's control and discretion, subject at all times to supervision of this Court.

24. As of the date of this Order, neither Christopher Delgado nor any other officer, director, manager, employee, agent, or representative of Goliath shall have decision-making authority on behalf of Goliath or the ability to bind Goliath. Upon the Receiver's acceptance, all such authority is vested exclusively in the Receiver, subject to further order of this Court.

### Powers and Duties of the Receiver

25. Upon acceptance, the Receiver is ordered and directed to take immediate possession, custody, and control of the Receivership Entity and all of its property, assets, and records, wherever located (the "Receivership Property"). The Receiver shall have all powers necessary and proper to preserve, secure, marshal, manage, operate, and, if appropriate, wind up the Receivership Entity, including without limitation the following powers:

    a. General Powers. To exercise all normal and customary powers of a receiver under Florida law and equity to protect and preserve the Receivership Property, including taking any action required to prevent fraud, self-dealing, waste, concealment, or dissipation. *See Granada Lakes*, 125 So. 3d at 758–60; *McAllister Hotel*, 40 So. 2d at 203.

    b. Exclusive Control. To exercise all powers of Goliath through or in place of its shareholders, officers, directors, managers, and agents, using best efforts to manage Goliath's affairs and preserve its assets.

    c. Accounts; Wallets; Custody. To take control of, access, secure, freeze, and/or transfer control over any and all bank accounts, exchange accounts, custodial accounts, payment processor accounts, cryptocurrency wallets, private keys, seed phrases, multi-signature settings, devices, and credentials used to hold, control, or access Receivership Property; and to open additional bank accounts and

****FILED: BROWARD COUNTY, FL Brenda D. Forman, CLERK 3/3/2026 11:56:10 AM.****

cryptocurrency wallets or custodial accounts in the Receiver's name for the benefit of Goliath as necessary to perform the Receiver's duties.

d. Records Preservation; Forensic Review. To take custody of and preserve all books and records of Goliath, including electronic records; to image devices and systems as necessary; and to retain forensic, accounting, blockchain analytics, cybersecurity, and other professionals to assist in identifying, tracing, securing, and recovering Receivership Property.

e. Operation; Expenses. To pay or cause to be paid costs reasonably necessary to protect and preserve Receivership Property and to pay ordinary-course expenses necessary to prevent waste. The Receiver may defer payment of disputed claims or investor claims pending further order of this Court and may propose a claims and distribution protocol for Court approval to ensure equity among claimants.

f. Litigation Powers. To institute, prosecute, defend, compromise, or settle litigation or claims for the benefit of Goliath, including actions to recover assets, avoid transfers, obtain injunctive relief, compel turnover, and protect the Receivership Property.

g. Asset Disposition. To dispose of Receivership Property, wherever located, at public or private sale, in the Receiver's name as receiver, as the Receiver deems necessary and appropriate to preserve value or prevent waste; provided that the Receiver shall seek further order of this Court before selling or encumbering any material real property or before making any distribution of net proceeds to investors/creditors.

h. Taxes; Compliance. To file or cause to be filed tax returns; to ensure compliance with applicable laws and lawful directives of governmental authorities; and to communicate with financial institutions, exchanges, custodians, regulators, and law enforcement as necessary to protect Receivership Property.

i. Professionals. To evaluate, employ and compensate agents, counsel, accountants, and other professionals necessary to perform the Receiver's duties. The Receiver may waive conflicts of interest to the extent waivable and in the best interest of the Receivership estate.

j. Borrowing; Receiver's Certificates. To borrow funds, from a third party or otherwise, at then-prevailing interest rates as necessary to perform the Receiver's duties and to issue receiver's certificates to evidence such borrowing; and to repay any such borrowing from the operation or assets of Goliath. The principal and

****FILED: BROWARD COUNTY, FL Brenda D. Forman, CLERK 3/3/2026 11:56:10 AM.****

interest evidenced by each such certificate shall constitute a first and prior lien and security interest upon the Receivership Property.

k.  Wind Up / Dissolution / Insolvency Proceedings. Within a reasonable time after acceptance, and in the Receiver's reasonable discretion, to initiate and/or pursue proceedings to wind up, dissolve, or liquidate Goliath in the appropriate forum or jurisdiction, and/or to file bankruptcy if the Receiver determines such relief is necessary to preserve assets, marshal claims, and protect victims and creditors.

## Inventory and Reporting

26.     Within thirty (30) days of the Receiver's acceptance (or within such additional time as the Court may permit upon reasonable request), the Receiver shall file and serve upon counsel of record an inventory of Receivership Property, including (i) cash, cryptocurrency, and other accounts; (ii) real property; and (iii) material miscellaneous tangible and intangible property. *See* Fla. R. Civ. P. 1.620.

27.     The Receiver shall provide periodic reports to the parties at least once every three (3) months (or more frequently if the Receiver deems appropriate), describing material receipts, expenditures, asset discoveries, asset dispositions, and the status of the Receivership Property.

## Non-Interference; Turnover; Service

28.     Goliath, Christopher Delgado, and all officers, directors, employees, agents, affiliates, representatives, and all persons acting in concert with any of them are enjoined from interfering with the Receiver's duties. They shall immediately cooperate with and provide full access to the Receiver, including immediate turnover of all books, records, devices, credentials, keys, seed phrases, wallet addresses, account information, contracts, and communications reasonably requested by the Receiver.

29.     The Receiver is authorized to serve this Order upon any person or entity as the Receiver deems appropriate in furtherance of his responsibilities and may record this Order in the Public Records of Broward County, Florida. Upon service of this Order and the Receiver's Notice, any person or entity holding Receivership Property is authorized and directed to recognize the Receiver's authority and to cooperate with the Receiver consistent with applicable law.

## Compensation; Retained Jurisdiction; Leave of Court

30.     The Receiver shall be paid a reasonable hourly rate for services. The Receiver may retain counsel and other professionals to assist in the receivership. The fees and costs of the Receiver and retained professionals shall be paid from Receivership Property unless otherwise ordered by the Court. The Receiver shall not be directly, indirectly, or derivatively liable for the debts of Goliath or its shareholders.

31.    This Court retains jurisdiction over the parties and the receivership for all purposes. No person or entity may sue the Receiver or take other action against the Receiver without further order of this Court. No subpoenas shall be served on the Receiver without leave of this Court.

32.    Any party may move for additional receiver powers, limitations, or instructions as may be necessary to enable the Receiver to perform his duties, or to dissolve or modify this Order. The Court will set such motions for hearing on an expedited basis.

### Bond; Enforcement

33.    Plaintiff shall post an injunction bond in the amount of $5,000.00 within five (5) days, which the Court finds reasonable and appropriate in light of the limited risk of harm to Goliath and the substantial likelihood that this receivership will preserve—not impair—Goliath's remaining assets for the benefit of lawful claimants.

34.    Willful violations of this Order by any person with notice of it may result in sanctions, including contempt, monetary sanctions, and any other remedies at law or in equity.

DONE AND ORDERED in Broward County, Florida, this 3rd day of ___March___, 2026.

CIRCUIT COURT JUDGE

STATE OF FLORIDA
BROWARD COUNTY
I DO HEREBY CERTIFY the within and foregoing is a true copy from the records on file in the office of the Circuit Court Clerk of Broward County, Florida. WITNESS my hand and Official Seal at Florida, the the _____ day of _____

Brenda D. Forman, Clerk

MAR 8 2026

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

CASE NO. <u>**CACE26003310**</u>   DIVISION: <u>**13**</u>   JUDGE: <u>**Robinson, Michael A (13)**</u>

**Mehal Patel**

Plaintiff(s) / Petitioner(s)

v.

**Goliath Ventures, Inc.**

Defendant(s) / Respondent(s)

_____/

**<u>AGREED ORDER</u>**

THIS CAUSE came before the Court upon the Receiver's Agreed Motion to Confirm Receivership Estate Includes Goliath Ventures Inc., a Florida Corporation (f/k/a Gen-Z Venture Firm Inc.) ("***Motion***") or otherwise to extend the estate. The Court considered the Motion and the record, and has been advised that the Plaintiff and parties that have intervened consent to the requested relief. Accordingly, it is

**ORDERED as follows:**

1. The Motion is GRANTED.

2. The scope of the receivership in this case includes Goliath Ventures Inc., a Florida corporation formerly known as Gen-Z Venture Firm Inc. ("***Florida Predecessor***").

3. Michael Budwick, Esq. is the Receiver for the Florida Predecessor.

4. The Amended Order on Plaintiff's Emergency Verified Ex Parte Motion to Appoint a Receiver entered March 3, 2026 shall apply with equal force and effect to the Florida Predecessor. The terms and provisions of that Order are incorporated herein by reference.

**DONE AND ORDERED** in Chambers at Broward County, Florida on <u>5th day of March, 2026</u>.

<u>CACE26003310 03-05-2026 12:15 PM</u>
Hon. Michael Robinson
**CIRCUIT COURT JUDGE**
Electronically Signed by Michael Robinson

**Copies Furnished To:**
Gabriel Enrique Morales , E-mail : avazquez@shawlewenz.com
Gabriel Enrique Morales , E-mail : gmorales@shawlewenz.com
Gabriel Enrique Morales , E-mail : lgrealy@shawlewenz.com
Jeffrey Sonn , E-mail : jsonn@sonnlaw.com
Jeffrey Sonn , E-mail : service@sonnlaw.com
Jordan Alexander Shaw , E-mail : jshaw@shawlewenz.com
Jordan Alexander Shaw , E-mail : kackerman@shawlewenz.com
Solomon B. Genet , E-mail : ltannenbaum@ecf.courtdrive.com
Solomon B. Genet , E-mail : gvallejo@melandbudwick.com
Solomon B. Genet , E-mail : sgenet@melandbudwick.com

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| Christopher Alexander Delgado | ) | |
| | ) | 6:26-mj- 1240 |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of _____February 1, 2024_____ in the county of _____Orange_____ in the
_____Middle_____ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

This criminal complaint is based on these facts:

See attached affidavit

☐ Continued on the attached sheet.

_____
*Complainant's signature*

████████ Special Agent, IRS-CI
*Printed name and title*

Sworn to before me over the telephone or other reliable electronic means and signed by me
pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: _____2/20/26_____

_____
*Judge's signature*

City and state: _____Orlando, Florida_____

HON. LESLIE HOFFMAN PRICE
*Printed name and title*

**EXHIBIT 2**

**STATE OF FLORIDA**                              CASE NO. 6:26-mj-1240

**COUNTY OF ORANGE**

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, ████████████, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I submit this affidavit in support of a criminal complaint against Christopher Alexander DELGADO for one count of 18 U.S.C. § 1343 (wire fraud) and one count of 18 U.S.C. § 1957 (money laundering).

2.      I am a Special Agent of the Internal Revenue Service, Criminal Investigation (IRS-CI), and have been so employed since 2021. My official duties as a Special Agent with IRS-CI include conducting complex financial investigations of individuals and businesses for violations of federal law, including tax-related financial crimes, money laundering, and bank and wire fraud. Prior to my employment with IRS-CI, I was a Special Agent with the United States Secret Service. I hold a Bachelor of Science Degree in Finance from the University of Central Florida.

3.      The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from law enforcement officers, reviews of documents related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and

information gained through my training and experience and the training and experience of others.

4.      Because I am submitting this affidavit for the limited purpose of securing a criminal complaint, I have not included every fact that I know about this investigation, nor have I included every fact I know about the full scope of the scheme. Instead, I have set forth only those facts that I believe are necessary to establish probable cause that DELGADO has violated 18 U.S.C. § 1343 and 18 U.S.C. § 1957.

## SUMMARY

5.      As set forth in more detail below, DELGADO operated GOLIATH as a Ponzi scheme whereby victims were solicited to invest[1] substantial sums of money under false and fraudulent promises of monthly returns, which were sometimes presented as guaranteed or low risk, generated through cryptocurrency "liquidity pools." Victims were induced to give money to GOLIATH through personal referrals, professional marketing materials, luxury events, charitable sponsorships, and some monthly payments of purported returns, all of which were designed to establish GOLIATH's bona

---

[1] GOLIATH's Joint Venture Agreement contained a provision that stated "[t]he Parties acknowledge and agree that this Agreement, and the Joint Venture and activities contemplated hereunder, are not an investment product, investment offering, investment advice, or a security in any way whatsoever." Regardless, many of the victims understood the money they sent to GOLIATH to be for investment purposes because they expected to receive returns on the money based on GOLIATH's marketing materials and their contracts.

2

fides with investors. Because of these false and fraudulent representations, DELGADO and his co-conspirators obtained at least $328 million from victim investors.

6. Although DELGADO and his co-conspirators represented that GOLIATH would place the funds it obtained from victim investors in cryptocurrency liquidity pools, in reality, investor funds were primarily used to pay purported returns to earlier investors, to return principal to investors who requested it, and for DELGADO's personal expenditures. Investigation showed that the vast majority of funds were not invested into liquidity pools.[2]

7. Examples of personal expenditures that DELGADO made using victim funds include:

    a. the purchase of the real property in Winter Park, Florida, in July 2025 for approximately $3.2 million;

    b. the purchase of the real property in Kissimmee, Florida, in December 2024 for approximately $1.15 million;

    c. the purchase of the real property in Windermere, Florida, in September 2025 for approximately $8.5 million; and

    d. the purchase of the real property in Sanford, Florida, in August 2024 for approximately $1.65 million.

---

[2] Blockchain analysis showed that approximately $1.5 million was sent to Uniswap, a decentralized exchange.

8.      DELGADO and his co-conspirators took various steps to hide the fraudulent scheme from the investors and to maintain their trust, including: (1) providing investors fabricated statements related to their investment that purported to show returns when there were none, (2) providing investors with bogus explanations for delayed payments and redemptions, and (3) allowing some investors to collect more money from GOLIATH than they initially invested, which allowed GOLIATH to continue operating because investors did not realize their returns were paid from other investors' money.

9.      Beginning in late 2025, when investors attempted to withdraw their principal or purported returns, GOLIATH delayed payments, provided shifting explanations, and ultimately restricted or terminated investor access to purported information about their investments.

## RELEVANT TERMS

10.     A "Ponzi scheme" is a form of investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors. Ponzi scheme organizers often solicit new investors by promising to invest funds in opportunities claimed to generate high returns with little or no risk. Rather than engaging in any legitimate investment activity, the fraudulent actors focus on attracting new money to make promised payments to earlier investors as well as to divert "invested" funds for personal use.

11.     "Fiat currency" is any type of government-issued currency, such as the United States dollar, that is used as legal tender by a specific nation,

4

government, or region's citizens. Fiat currency is not backed by a physical commodity, but instead by the government that issued it.

12. "Cryptocurrencies," such as Bitcoin and USD Coin ("USDC"), are electronically sourced units of value that exist on the internet. USDC is a U.S. dollar-pegged cryptocurrency designed to maintain a value of one U.S. dollar per token. Cryptocurrencies are generated and tracked through computer software in a peer-to-peer network, rather than issued from a government or other entity. Users of cryptocurrencies send units of value to and from "addresses," which are unique strings of numbers and letters that function like a public account number. Cryptocurrency transactions are recorded on a publicly available, distributed ledger, often referred to as a "blockchain."

13. A "blockchain" is a distributed database maintained across a network of computers. Each transaction is grouped into a "block," which is then cryptographically linked to the previous block, forming a chronological and tamper-resistant chain. Once a transaction is recorded on the blockchain, it cannot be altered or deleted without detection.

14. Cryptocurrency ownership is controlled by cryptographic keys. A "public address" functions similarly to a bank account number and is used to receive cryptocurrency. A corresponding "private key" is required to authorize transactions and transfer cryptocurrency from one address to another. Possession of the private key allows the holder to control and move the

5

cryptocurrency. Private keys may be stored in various forms, including software applications, hardware devices, written records, or cloud-based storage.

15. Cryptocurrency may be stored in digital "wallets," which can exist as applications on computers or mobile devices, online accounts hosted by cryptocurrency exchanges, or specialized physical devices known as hard wallets.

16. A "cryptocurrency exchange," such as Coinbase, is a type of digital currency exchange where cryptocurrency can be bought, sold, and traded for fiat currency or other digital assets.

17. Coinbase is a United States-based cryptocurrency exchange and financial technology company that operates an online platform through which individuals and entities can buy, sell, transfer, store, and manage digital assets, including cryptocurrencies such as Bitcoin and USDC. Coinbase provides hosted digital wallets, brokerage services, and trading functionality that allow users to convert fiat currency into cryptocurrency and vice versa. Coinbase accounts are typically associated with verified user identities and may be linked to bank accounts, debit cards, or other payment methods to facilitate deposits and withdrawals. The platform maintains records of account activity, including transactions, transfers, and balances.

18. A "decentralized exchange" is a peer-to-peer marketplace that connects cryptocurrency buyers and sellers. In contrast to centralized exchanges, such as Coinbase, decentralized platforms are non-custodial, meaning a user

6

remains in control of their private keys when transacting on a decentralized exchange. In the absence of a central authority, decentralized exchanges employ smart contracts that self-execute under set conditions and record each transaction to the blockchain.

19. A "smart contract" is a digital agreement stored and executed on a blockchain network. Smart contracts are programmed to perform specific actions once predefined conditions trigger them.

20. A "liquidity pool" is a crowdsourced pool of coins or tokens that are locked in a smart contract and used to facilitate trades between those assets on a decentralized exchange. Liquidity pools enable users to buy and sell cryptocurrency on decentralized exchanges or "DeFi" platforms, such as Uniswap, without the need for centralized exchange.

21. Liquidity pools are typically funded by individuals who deposit pairs of cryptocurrency tokens into the pool. Depositors typically receive a portion of transaction fees or other incentives generated by trading activity within the pool. Trades conducted through liquidity pools are executed automatically by smart contracts. These formulas adjust the price of assets in the pool based on supply and demand. As trade occurs, the balances of the pooled assets change, and the value of a depositor's share of the pool may increase or decrease accordingly.

22. GOLIATH VENTURES ("GOLIATH"), formerly known as Gen-Z Venture Firm, was established in Florida in February 2019. DELGADO

7

served as the President and a Director of Gen-Z Venture Firm. In September 2021, Gen-Z Venture Firm changed its name to GOLIATH. DELGADO served as the President and Chief Executive Officer of GOLIATH.

23. According to information provided to potential investors, including marketing materials and GOLIATH's website, GOLIATH is "a joint venture private fund that invested in blockchain and cryptocurrency projects." GOLIATH further characterized itself as "a pioneering firm specializing in blockchain development and decentralized finance strategies" and purported to leverage "liquidity pools to facilitate passive income generation, enhance market efficiency, and provide qualified investors with access to innovative financial opportunities."

## PROBABLE CAUSE

24. This affidavit first describes the information provided to potential investors to solicit their funds, then describes the promises that GOLIATH, through DELGADO, made in contracts, and then describes how money moved through GOLIATH's bank accounts and cryptocurrency wallet. The affidavit goes on to explain how GOLIATH and DELGADO's use of investors' money differed from what was promised through marketing materials and contracts. Finally, the affidavit provides examples of two investors' experiences with GOLIATH and DELGADO. One investor lost approximately $720,000, despite promises from GOLIATH that he would get a guaranteed return and that his investment could be returned at any time. The other investor recovered his funds

8

and the promised interest, though he had to communicate directly with DELGADO to do so, and DELGADO pushed back against the investor's recovery of his money.

Solicitation of Investor Funds, Contracts,
and GOLIATH's Online Portal

25. From January 2023 through January 2026, investors were told by DELGADO and GOLIATH directors through presentations and marketing materials that their funds would move from a traditional bank account in the name of GOLIATH to Coinbase, then to an "encrypted ledger," and ultimately into liquidity pools where returns would be generated. The following is a representation of GOLIATH's investment cycle that was presented to investors through marketing materials.



26. From January 2023 through January 2026, GOLIATH entered into "Joint Venture Agreements" with victim investors. These agreements were often signed by DELGADO on behalf of GOLIATH. In these agreements, GOLIATH would "partner" with victim investors and purport to enter a joint venture that would utilize investor funds to make deposits into liquidity pools. The Joint Venture Agreements outlined terms and conditions of the investments, including details about how GOLIATH would invest in liquidity pools and the distribution of the return on the investors' investment. The Joint Venture Agreements sometimes guaranteed monthly returns ranging from three to eight percent or guaranteed the return of an investor's principal. Investors were offered the option to withdraw their monthly return or "roll over" monthly returns, increasing their account balances. GOLIATH employed associates, known as directors, who were responsible for soliciting investors on behalf of GOLIATH. GOLIATH represented to investors that the company would generate its revenue by charging fees to investors.

27. Investors were provided with regular account updates through their online portals reflecting consistent monthly gains. Investors could access their account through an online portal, including a mobile application.

28. As described further herein, though, the information provided in the investment materials, the contracts, and the online portal was false and fraudulent as the investors' funds were neither used as promised nor used for any investment activity, with the possible exception of the approximately $1.5

10

million deposited in Uniswap referenced above, and were instead primarily maintained essentially as cash in GOLIATH's bank accounts and cryptocurrency wallets.

<u>GOLIATH's Bank Accounts and Coinbase Wallets</u>

29. While in operation, GOLIATH held business bank accounts at JP Morgan Chase and Bank of America. IRS-CI Investigative Analyst Noel Martinez reviewed records from GOLIATH's JP Morgan Chase business account ending in 0305 (hereinafter "the JPMC 0305 account") and GOLIATH's Bank of America business account ending in 9136 (hereinafter "the BOA 9136 account") for the period from January 2023 through September 2025.

30. DELGADO was the sole signatory on the JPMC 0305 account in the name of GOLIATH. DELGADO controlled the account.[3] GOLIATH directors told at least one investor that DELGADO determined how investor funds would be allocated and directed transfers from GOLIATH accounts. In addition, bank records establish that DELGADO used funds from this account for several personal expenditures, including a wire transfer of $358,890.46, on or about August 5, 2024, towards the purchase of real property in Sanford, Florida 32771, in August 2024, which is titled in his name. The fact that DELGADO

---

[3] Based on my training and experience, executive officers of large corporations usually delegate authority to associates to make certain transfers, including expenses for nominal amounts, from business bank accounts. Based on my training and experience, I would expect the signatory on a bank account to maintain oversight of the account.

used the account to fund his personal expenses supports my belief that he had ultimate control of the account.

31. DELGADO was a co-signor on the BOA 9136 account in the name of GOLIATH. While other individuals may have had access to the account, GOLIATH directors told at least one investor that DELGADO controlled the account and that he determined how investor funds would be allocated and directed transfers from the account. In addition, DELGADO used funds from the account for several personal expenditures, including a wire transfer of $500,000, on or about July 30, 2025, towards real property in Windermere, Florida, in September 2025, which is titled in his name. As with the JP Morgan Chase account, DELGADO's use of the Bank of America account to fund his personal expenses supports my belief that he had ultimate control of the account.

32. DELGADO was the sole signatory on GOLIATH's Coinbase wallets. GOLIATH directors told at least one investor that DELGADO determined how investor funds were allocated and directed transfers from this wallet.

33. Funds sent to GOLIATH from investors were primarily deposited into the JPMC 0305 account or the BOA 9136 account or transferred directly to GOLIATH's wallets at Coinbase. For example:

    a. From January 2023 through June 2025, approximately $253 million was deposited into the JPMC 0305 account.

12

b. From May 2025 through September 2025, approximately $75 million was deposited into the BOA 9136 account.

c. From January 2023 through January 2026, approximately $62 million was received by GOLIATH's wallets at Coinbase.

34. From January 2023 to September 2025, approximately $165 million was sent to GOLIATH's Coinbase wallets from the JPMC 0305 account and the BOA 9136 account.

a. From January 2023 through June 2025, approximately $123 million from the JPMC 0305 account to GOLIATH's wallets at Coinbase.

b. From May 2025 through September 2025, approximately $42 million from the BOA 9136 account to GOLIATH's wallets at Coinbase.

<u>Fraud</u>

35. DELGADO, individually and through authorized representatives, made the following false and fraudulent representations to victim investors to induce them to give money to GOLIATH purportedly for deposits into cryptocurrency liquidity pools:

a. GOLIATH's marketing materials represented to investors that their funds would be deployed into a structured and actively managed DeFi liquidity pool strategy, primarily focused on USDC pairing on Uniswap. The materials described sophisticated risk management tools—including stop-loss mechanisms, slippage monitoring, and centralized exchange hedging—and portrayed the strategy as a

13

disciplined, yield-generating liquidity pool program designed to benefit accredited investors. These representations were materially false and misleading because, despite raising approximately hundreds of millions of dollars from investors, GOLIATH deployed only about $1 million into any liquidity pool. The overwhelming majority of investor funds were not used in the liquidity pool strategy described in marketing materials, directly contradicting the core representations that investor capital would be allocated to and managed within such DeFi liquidity pools.

b. The Joint Venture Agreement ("Agreement"), which GOLIATH commonly presented to investors, falsely represented to the victim investors that their funds would be invested into cryptocurrency liquidity pools. The Agreement falsely assured the investors that the liquidity pools would run on one or more exchanges (such as Uniswap).

c. The Agreement falsely represented to the investors that any profits generated from a Venture would be distributed on a monthly basis and that the investor had the option of selecting either a monthly payout or a monthly rollover wherein the profits would be reinvested.

d. The Agreement falsely represented to the investors that an investment in a Venture would generate a monthly return on investment of three to eight percent. Returns were sometimes described as guaranteed, and some investors were told that their principal was guaranteed.

14

e. The Agreement falsely told investors that they could remove their money at any time.

f. DELGADO often signed these contracts on behalf of GOLIATH.

g. GOLIATH provided investors with access to an online account portal that purported to display real-time account activity, including invested principal and returns earned. While the amounts of principal invested were accurately reflected, the reported returns were materially false and misleading. In reality, little to no investor funds were deployed into the investment strategy described, and the "returns" displayed in the portal were not generated from actual trading or liquidity pool activity. Instead, the returns were artificially calculated and manipulated to match the rate of return offered to each investor, creating the false appearance of legitimate investment performance.

36. Based on analysis of bank records and blockchain for the period January 2023 through January 2026, GOLIATH invested little, if any, investor funds in cryptocurrency investments. Instead, GOLIATH used investor funds to pay phony returns to earlier investors. Despite false representations to investors, only a nominal amount of investor funds were transferred to liquidity pools. Instead, investor funds were either held in traditional bank accounts or, if they converted to cryptocurrency, were held as USDC, a cryptocurrency "stablecoin" which is pegged to the United States dollar.

15

37. At the request of IRS-CI, Chainalysis Government Solutions, LLC ("CGS")[4] analyzed the flow of cryptocurrency related to GOLIATH's known cryptocurrency wallets, including relevant documents from Coinbase exchange and investors, through a blockchain analysis. CGS analysis confirmed that investor funds were moved between traditional accounts or converted to USDC, but they were not deposited into liquidity pools, with the possible exception of the approximately $1.5 million deposited in Uniswap referenced above, or used for other investment activity. The funds from GOLIATH's cryptocurrency wallets were transferred to wallets held by representatives of GOLIATH and to wallets held by investors.

38. For example, from January 2023 through June 2025, approximately $50 million from the JPMC 0305 account was sent to investors purportedly as returns on investments. Although GOLIATH falsely represented that these payments were returns on investments, they primarily were funded with money held in the JPMC 0305 account that investors sent to GOLIATH for investing purposes. They were not returns from any investment activity.

39. From May 2025 through September 2025, approximately $11 million from the BOA 9136 account was sent to investors purportedly as returns on investments. These funds primarily originated from funds held in the BOA

---

[4] CGS provides blockchain analysis and investigation software (Reactor) to government agencies. Reactor allows investigators to trace and visualize, across multiple blockchains, transactions linked to criminal activity.

9136 account that investors sent to GOLIATH for investing purposes and were not returns from any investment activity.

40. Funds from investors were also used to pay for GOLIATH's corporate spending, including payments for corporate credit cards, extravagant business gatherings, Christmas parties, and luxury travel accommodations.

41. Investors' balances and returns reflected in the GOLIATH accounts, as provided to investors through GOLIATH's online portal, were fictitious and not tied to actual investment of their money in a liquidity pool. Instead, balances were artificially manipulated to reflect promised returns, creating a false appearance of consistent profitability. For example, account overviews for GOLIATH investors reflected "Monthly Distribution Rates" and "Monthly Distribution Balances" that purported to reflect returns on investment. In reality, there were no such returns. An example of a GOLIATH account overview is pictured below; it demonstrates that the information provided to investors was simplistic and did not show any investment- or liquidity-pool-specific particulars.

17

| | |
|---|---|
| Current Account Balance | $122,892.84 |
| Monthly Distribution Balance | $6,144.64 |
| Total Contributions | $0.00 |
| Monthly Distribution Rate | 5.00% |
| Exec Partner | ███████████ |
| User ID | ███████████ |

## Money Laundering

42.     Coinbase accepts both ACH payments and Fedwire transfers in the United States. Coinbase partners with Plaid as a third-party intermediary to link external bank accounts for ACH transfers and partners with Cross River Bank to support Fedwire transfers of fiat currency to and from Coinbase.

43.     Cross River Bank is headquartered in Fort Lee, New Jersey. Coinbase customers are provided with a routing and account number which Cross River Bank processes on their behalf to apply funds to Coinbase account.

44.     GOLIATH's Coinbase account was linked to the JPMC 0305 account and capable of conducting both ACH (Automated Clearing House)[5]

---

[5] The ACH network is a nationwide electronic fund transfer system operated through the Federal Reserve and national clearing centers. It connects most U.S. banks and credit

and Fedwire[6] transactions. From October 2022 to February 2025, all deposits of fiat currency into GOLIATH wallets were Fedwire deposits. Based on my training and experience, both ACH transactions and Fedwire transactions involve interstate wires.

45. Analysis of bank records showed that GOLIATH electronically transferred funds to Coinbase from the JPMC 0305 account. Specifically, on or about February 1, 2024, DELGADO, did knowingly engage in a monetary transaction by through or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is the transfer of $300,000 of U.S. currency, such property having been derived from a specified unlawful activity, that is, wire fraud. This transfer included $40,000 that Investor 1 had given to GOLIATH on February 1, 2024, with the understanding that it would be used in a liquidity pool, as will be described in more detail below. The transfer also included the money of other investors given with a similar understanding.

46. Prior to the $300,000 transfer to Coinbase on February 1, 2024, the JPMC 0305 account had a $10.5 million balance. Because this account was funded almost exclusively with investor funds, there is probable cause to believe

---

unions, enabling the electronic, batch-processed debits and credits between financial institutions across state lanes.

[6] Fedwire is an electronic funds-transfer system operated by the 12 Federal Reserve Banks. It acts as a national, high-speed network that settles large-value, real-time payments across state lines, connecting financial institutions throughout the country.

that the entire balance in the account on February 1, 2024 constituted proceeds of the wire fraud. Further review of account records revealed that approximately $956,990 of investor funds were deposited via wire transfers between January 31, 2024, and February 1, 2024, and no withdrawals were made prior to the $300,000 transfer. Therefore, using the last-in, first-out ("LIFO") accounting principle, the entire $300,000 transfer to Coinbase was funded with wire fraud proceeds.

Investor 1

47. As part of the investigation into GOLIATH, IRS-CI Special Agent Richard Smith interviewed Investor 1, a resident of Seminole County, Florida. Investor 1 demonstrates how GOLIATH solicited investors and made false promises to them about how their money would be used; ultimately, Investor 1 lost approximately $720,000.

48. Investor 1 told SA Smith that he was introduced to GOLIATH through an acquaintance, who stated to Investor 1 that he had invested approximately $1,000,000 with GOLIATH and was receiving consistent monthly returns. The acquaintance introduced Investor 1 to a representative of GOLIATH. During an in-person meeting in Seminole County, Florida, the GOLIATH representative and the acquaintance presented to Investor 1 an investment opportunity described as participation in cryptocurrency liquidity pools with guaranteed monthly returns of seven percent.

20

49. Investor 1 was instructed to establish a Coinbase account to receive payouts. In March 2023, he initially invested $10,000 and received a first-month payout of approximately $700, representing a seven percent monthly return. The initial payment and subsequent payments were timely and consistent, which reinforced Investor 1's belief that the investment was legitimate and low risk.

50. GOLIATH's agreement with Investor 1 was memorialized in a "Joint Venture Agreement" on June 23, 2023. DELGADO signed the agreement on behalf on GOLIATH. The agreement falsely represented that the funds would be invested in liquidity pools:

**3. JOINT VENTURE**

3.1. In executing this Agreement, the Parties have agreed to enter a joint venture for the purpose of carrying out the particular project of utilizing their cryptocurrencies by making Contributions into liquidity pools which shall run on one or more exchanges (such as Uniswap) and shall involve the pairing of a combination of cryptocurrencies to exchanges wherein, in lieu of interest, an exchange pays exchange fees for the use of the pairing to create liquidity. Each liquidity pool that the Parties collectively decide to contribute to shall be considered a "**Venture**".

51. The agreement also set forth the so-called "Distribution of Profits" and guaranteed a return of seven percent monthly:

**6. DISTRIBUTION OF PROFITS**

6.1. From any profits that are made, the distribution of profits will be as follows:

6.1.1. The Partner shall be entitled to monthly profits generated by its Contributions, ("**Profit(s)**"):

6.1.1.1. **For Ethereum, Bitcoin, and USDC:** profit margins will deliver 7% monthly, paid in USDC.

52. In December 2023, Investor 1 attended a GOLIATH-hosted investor event at the Four Seasons Resort in Orlando, Florida. Investor 1 described the event as extravagant and professionally organized, with numerous

21

attendees, which further reinforced his belief that GOLIATH was a legitimate, well-capitalized enterprise.

53. In May 2024, Investor 1 became involved with a charitable organization and learned that GOLIATH was a major sponsor. Through this involvement, Investor 1 met DELGADO, whose public association with charities and community events further induced Investor 1 to trust the legitimacy of GOLIATH.

54. Based on the representations about the cryptocurrency liquidity pool investment made by the GOLIATH representative and the acquaintance and the consistency of the early payouts, Investor 1 continued investing additional funds and reinvesting purported returns. Between mid-2023 and late 2024, Investor 1 invested approximately $720,000. Of this amount, approximately $420,000 was transmitted via domestic wire transfers from Investor 1's personal bank account, and approximately $300,000 was transmitted via cryptocurrency transfers from Investor 1's Coinbase account to wallet addresses provided by GOLIATH. Specifically, on or about the following dates, DELGADO, for the purpose of executing the aforesaid scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly, and with intent to defraud, cause Investor 1 to transmit by means of wire in interstate commerce, the following funds:

     a. $40,000 on February 1, 2024;

22

b. $110,000 on March 26, 2025.

55. In late 2025, GOLIATH began delaying payments to the victim investors and attributed the delays to audits, banking issues, and compliance matters. Despite repeated assurances made by GOLIATH that payments would resume, the explanations changed over time, and no supporting documentation was provided. Investor 1 was advised that payments would resume on or about December 18, 2025, however, no additional payments were ever made.

56. In early January 2026, Investor 1 requested an exit from the "Joint Venture" with GOLIATH and requested a return of $862,000 in principal and accrued returns. On January 9, 2026, GOLIATH represented that his funds would be returned:



This thread is correct. We have your exit pending signature and between our pending pay (October and November) we have a total of $862,800 going back to you.

$42,000 for October
$50,400 for November
$720,000 exit for December and the earned distribution of $50,400.

Best,

**GOLIATH** VENTURES





goliathventuresinc.com

57. After Investor 1 contacted his bank to request wire reversals[7] and filed a police report with the Seminole County Sheriff's Office, GOLIATH was contacted by Bank of America regarding the reversal. Shortly thereafter, Investor 1 received a hostile text message from the GOLIATH representative, stating, "What are you doing man? You recalled funds from Bank of America from May?", demonstrating awareness of the bank inquiry and an attempt to challenge Investor 1's efforts to recover his funds. Investor 1's attempts to recover the funds have been unsuccessful.

58. At the time of the interview with law enforcement on January 22, 2026, Investor 1 stated that GOLIATH had stopped responding to his communications and blocked his access to the GOLIATH investor application. To date, GOLIATH has not returned funds to Investor 1, and he has lost approximately $720,000.

<u>Investor 2</u>

59. As part of the investigation into GOLIATH, IRS-CI SA Richard Smith interviewed Investor 2, a resident of Orange County, Florida. Investor 2 demonstrates the nature of GOLIATH as a Ponzi scheme because he received his money back, plus the returns he was promised, despite GOLIATH not using his money as promised. Further, Investor 2's experience shows DELGADO's

---

[7] A wire reversal is a process where the bank that receives a wire transfer returns the funds to the sender's bank. This usually occurs when the receiving bank does not accept the incoming funds. Typically, wires cannot be reversed after the receiving bank has accepted the incoming funds.

personal involvement with GOLIATH investors, including pressuring Investor 2 to leave his funds with GOLIATH.

60. Investor 2 was referred to GOLIATH by a representative of GOLIATH, who told Investor 2 about the representative's own investment with GOLIATH and about how the monthly returns he received were very good. The representative also stated that Investor 2 could request his principal investment back from GOLIATH at any time.

61. Prior to investing in GOLIATH, in July 2024, Investor 2 met with the GOLIATH representative and DELGADO at a restaurant located in Orlando, Florida. During the dinner, DELGADO told Investor 2 about the investment opportunity with GOLIATH. The investment purportedly utilized liquidity pools and involved money markets and the buying and selling of stock pertaining to cryptocurrency.

62. In August 2024, Investor 2 invested $1 million with GOLIATH. The monthly rate of return was five percent, per Investor 2's contract.

63. In November 2024, Investor 2 spoke to the GOLIATH representative and DELGADO about opportunities involving cryptocurrency. Investor 2 invested an additional $15 million with GOLIATH in December 2024. The terms of the contract regarding Investor 2's additional investment stated there would be a seven percent monthly return for six months and then a seven and a half percent monthly return for the next six months.

64. In December 2024, Investor 2 attended a Christmas party hosted by GOLIATH. During the party, DELGADO made an announcement to the attendees that GOLIATH had secured insurance and a fidelity investment bond that would cover the principal investments made by investors.

65. After DELGADO made the announcement about the insurance and the fidelity bond at the 2024 Christmas party, Investor 2 asked to view documentation pertaining to the insurance and the bond. DELGADO declined Investor 2's request for the documentation because of potential disclosure of personal information. DELGADO's refusal caused Investor 2 to become uneasy about his investment with GOLIATH. After DELGADO declined Investor 2's request to view the documentation, Investor 2 requested the return of his principal investment.

66. After Investor 2 requested his principal investment back from GOLIATH, DELGADO sent Investor 2 an email detailing that DELGADO was not pleased with Investor 2's request for the return of his principal investment. On January 24, 2025, DELGADO emailed Investor 2 stating:

> I received your request for a full return of your partnership funds with GOLIATH. There are two quick points I would like to address before proceeding.
>
> #1 - Per our agreement, the percentage honored on GOLIATH'S part was solely based on maintaining an account over $10M USD (addendum attached)
>
> #2 - Per our conversation, I only allowed such increase in percentage because of the time frame in which you had agreed to have in GOLIATH.

26

From the viewpoint of the company, you are taking advantage of the opportunity we have allowed you to be a part of. Secondly, you are not honoring our conversation nor our agreement. At the end of the day, you are completely entitled to your funds, but you are NOT entitled to engage and re-engage with GOLIATH at your discretion. That is completely up to the company.

We will start to reconvert your funds on Monday back to USD from USDC per your request BUT you will forfeit the January distribution since our agreement and our personal conversation was broken. Secondly, if you wish to re-engage with GOLIATH, it will be at the SOLE discretion of me and will be at a rate of 1% per month with zero increase based on account value.

I will give you til Sunday to decide if you should liquidate your whole account and if I do not hear from you, we will terminate your agreement and start to wire back your funds next week.

67. In February 2025, GOLIATH sent Investor 2 a total of approximately $7.1 million; it sent an additional $10.6 million in March 2025. These funds represented the return of Investor 2's principal investment and returns on investment from the company.

27

## CONCLUSION

68.     Based on the foregoing, I submit that probable cause exists that

DELGADO did knowingly and willfully engage in wire fraud and money

laundering, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1957.



Special Agent
Internal Revenue Service

Affidavit submitted electronically and attested to me
as true and accurate by videoconference consistent
with Fed. R. Crim. P. 4.1 and 41(d)(3)
before me this _20th_ day of February, 2026.

HON. LESLIE HOFFMAN PRICE
United States Magistrate Judge